# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RACHEL YBARRA, as Special Administrator of the Estate of RAFAEL CRUZ, deceased,<br><br>     *Plaintiff,*<br>v.<br><br>CITY OF CHICAGO, an Illinois municipal corporation, FRANCIS A. VALADEZ, and MONICA REYES,<br><br>     *Defendants.* | 16 C 8009<br><br>Hon. Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rachel Ybarra, mother of Rafael Cruz who was shot and killed by Chicago Police in August 2015, filed this civil rights action as the Special Administrator for the Estate of Rafael Cruz against the City of Chicago and Commander Francis Valadez and Officer Monica Reyes of the Chicago Police Department. (Dkt. 1). The Complaint alleges claims of excessive force under 42 U.S.C. § 1983 (Count I) and wrongful death under Illinois law (Count II). (*Id.*). Presently before the Court is Defendants' Motion for Summary Judgment on both counts. (Dkt. 51). For the following reasons, Defendants' Motion is granted.

## STATEMENT OF FACTS

The Court takes the relevant facts from the parties' Local Rule ("LR") 56.1 statements of undisputed material facts and supporting exhibits.[1] The following facts are supported by the record and, except where otherwise noted, are undisputed. The Court views these facts in the light most

---

[1] *See* Defendants' Local Rule 56.1(a)(3) Statement of Undisputed Material Facts (Dkt. 52), Plaintiff's Local Rule 56.1(b)(3) Response to Defendants' Statement of Undisputed Material Facts (Dkt. 57), Plaintiff's Local Rule 56.1(b)(3)C Statement of Additional Disputed Material Facts (Dkt. 58), and Defendants' Response to Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional [Und]isputed Material Facts (Dkt. 62).

favorable to Plaintiff as nonmovant and draws all reasonable inferences in her favor. *See Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018).

In the early morning of August 29, 2015, Commander Valadez and Officer Reyes ("the Officers") were on patrol in the 10th District driving an unmarked blue Ford Taurus police vehicle. (Dkt. 57 at ¶ 9). Valadez was driving and Reyes was in the front passenger seat. (*Id.*). The Officers were dressed in civilian clothes and each wore a police vest, a duty belt and a radio. (*Id.* at ¶ 10). At approximately 1:30 a.m., the Officers stopped near Blue Island Avenue and Wood Street when they heard gunshots and observed a person in the rear passenger side of a Chevy Tahoe traveling eastbound on 23rd Street fire shots into a Lincoln Navigator traveling alongside of the Tahoe. (*Id.* at ¶ 11–13). The Officers also observed muzzle flashes coming out of the rear passenger side of the Tahoe. (*Id.* at ¶ 12).

The occupants of the Tahoe were Rafael Cruz, Erik Martinez, Jose Cabello, and Pasquel Neva, all members of the Bishops street gang. (Dkt. 62 at ¶¶ 1, 3). The men had been driving around and travelled into a neighborhood controlled by a rival gang. (*Id.* at ¶ 4). Cruz was driving the Tahoe, which had dark, tinted windows. (Dkt. 57 at ¶¶ 20, 59). Martinez, who was in the rear passenger seat of the Tahoe, fired the shots into the Navigator after noticing the driver was a member of a rival gang and was armed. (Dkt 62 at ¶ 4). After the shooting, the Tahoe sped away from the area going between 40 and 70 mph. (*Id.* at ¶ 6).

Upon witnessing the incident, Officer Reyes called in an "emergency" and "shots fired" over the police radio. (Dkt. 57 at ¶¶ 13–14). Valadez testified that as the Tahoe drove past the Officers, he noticed the driver's side windows were rolled up. (*Id.* at ¶ 17). Valadez then followed the Tahoe while Reyes called out a description of the vehicle and its direction of travel over the radio. (*Id.* at ¶ 18; Dkt. 62 at ¶ 8). Valadez maintained a distance of about half a block behind the

Tahoe. (Dkt. 62 at ¶¶ 9–10). The Officers did not activate the emergency lights on the unmarked car as they followed the Tahoe. (*Id.* at ¶ 23). The Officers followed the Tahoe for approximately one mile as it drove northbound on Wood Street, turned eastbound on Cermak Road, and then proceeded northbound on Ashland Avenue. (*Id.* at ¶ 11). The Officers believed there were multiple occupants and at least one gun inside the Tahoe (Dkt. at 57 ¶ 21–22), testifying that they never saw a gun get thrown out of the Tahoe after it drove away from the scene of the shooting. (*Id.* at ¶ 19).

The parties dispute whether the occupants of the Tahoe knew they were being followed by police. Cabello testified that he did not notice any vehicle following the Tahoe at all until right before they turned on Ashland when Cruz noticed the vehicle and told the others that someone was following them. (Dkt. 62 at ¶ 7). Nava testified, however, that he noticed the car following them "[a]lmost immediately," and told Cruz and the others. (Dkt. 62-6 at 57:19-58:6). Each testified that he did not know who was in the vehicle and did not believe it was police. (Dkt. 62 at ¶¶ 7, 10; Dkt. 62-6 at 50:18–51:5, 57:14–18). Nava testified that he initially thought the car was a rival gang member but, after no one in the car retaliated, believed it was a "brave citizen" taking down their license plate number and calling the cops. (Dkt. 62-6 at 57:19–23, 58:19–59:2). Both testified also that it was clear the vehicle they saw was following them because it was trying to keep up closely with the Tahoe. (Dkt. 62 at ¶¶ 7–8).

While traveling northbound on Ashland in the right-hand lane, the Tahoe made a left turn to go westbound onto 19th Street. (Dkt. 57 at ¶ 23). A surveillance camera located in the parking lot of the Dominican Friar's church facing toward 19th Street captured what occurred next. (*Id.* at ¶¶ 24–25). The video shows a number of pedestrians and bicyclists traveling on 19th Street near the church parking lot within twenty minutes of the Tahoe arriving on the scene. (*Id.* at ¶ 26).

3

Then, it shows the Tahoe making a left turn from Ashland onto 19th Street and striking a parked car on the north side of the street. (*Id.* at ¶ 29). Two seconds later, the unmarked police vehicle also turned left onto 19th Street. (*Id.* at ¶¶ 27–28). The Tahoe continued westbound on 19th Street, crashed into a parked car on the south side of the street, and then came to a brief stop at the entrance of the parking lot on the south side of 19th Street. (*Id.* at ¶¶ 32–33). The police vehicle stopped behind the Tahoe. (*Id.* at ¶ 33). The Officers believed the Tahoe had stalled due to damages sustained from crashing into parked cars but the Tahoe then reversed and struck the police vehicle on the driver's side. (*Id.* at ¶¶ 34–36).

Valadez testified that after stopping the police vehicle behind the stopped Tahoe and before the Tahoe reversed, he had begun exiting the police vehicle and announced his office but then had to dive back into his vehicle to avoid being hit when the Tahoe reversed and struck the police vehicle on the driver's side. (*Id.* at ¶ 37). Plaintiff disputes whether Valadez ever exited the police vehicle or announced his office. Cabello testified that he never heard either Officer say anything from the police vehicle. (Dkt. 52-7 at 72:5–17, 74:17–12). The video does not clearly show whether either Officer attempted to exit the vehicle before it was struck.

After striking the police vehicle, the Tahoe drove forward and turned left into the church parking lot. (Dkt. 57 at ¶ 39). The Officers exited their vehicle and ran into the parking lot by foot, Valadez first followed by Reyes. (*Id.* at ¶ 40). The parking lot was "pretty well lit" with at least two parked cars in it that were separated by at least two empty parking spots. (Dkt. 62 at ¶ 14). The parking lot had only one exit for vehicles: the same gate the Tahoe used to enter. (*Id.* at ¶ 13). Valadez ran to the side of the parking lot furthest from the exit while Reyes positioned herself closer to the exit; they were separated by one of the parked cars. (*Id.* at ¶ 46). Valadez testified that he yelled "police" while running into the parking lot but both Cabello and Nava

4

testified that they never heard anyone announce that he or she was police. (Dkt. 57 at ¶ 41; Dkt. 52-7 at 83:9–22; Dkt. 62-6 at 72:3–14, 109:19–21). Nava testified further, however, that he knew at that point that Valadez was police because he saw that he was wearing a vest. (Dkt. 62-6 at 72:3–14).

The Tahoe made a three-point turn inside the parking lot, reversing and then pulling forward again toward the exit gate. (Dkt. 57 at ¶ 42). Valadez testified that as the Tahoe finished backing up, he saw the driver's window lower two to three inches and believed the driver was about to start shooting at him and/or Reyes. (Dkt. 52-2 at 78:11–79:7, 81:20–82:24, 102:10-103:6). As the Tahoe pulled forward, Valadez shot three times at the driver. (Dkt 62 at ¶ 25).

Plaintiff disputes that Cruz lowered his window while making the three-point turn. (Dkt. 57 at ¶¶ 31, 43–45). Plaintiff claims "screen grabs" generated by police practices expert Professor William Harmening and showing zoomed-in still images of the video surveillance footage "unequivocally" demonstrate that the driver's window of the Tahoe had already been rolled down at least by the time it turned left onto 19th Street, before the Tahoe ever entered the parking lot. (Dkt. 62 at ¶ 28). While by no means "unequivocal," a reasonable juror viewing the screen grabs could agree with Plaintiff.

As Valadez fired shots at the driver, the Tahoe continued forward toward the exit in Reyes' general direction. (*Id.* at ¶ 48). Reyes heard gunshots and then fired her own weapon five times at the driver of the Tahoe as the vehicle passed her. (*Id.* at ¶¶ 50, 53–54). Reyes yelled at the Tahoe to "stop" several times before firing. (*Id.* at ¶ 49). Reyes testified also that she could see the driver's profile through the partially open window. (*Id.* at ¶ 27).

Reyes testified that she did not know from where or whom the gunshots she heard came but that she believed at the time she fired her weapon that she was about to be fired upon. (*Id.* at

5

¶¶ 51–52). Plaintiff disputes this and claims Reyes knew the gunshots she heard came from Valadez and not from the Tahoe, relying primarily on audio recordings of the dispatch radio transmission from August 29 on which Reyes can be heard calling in "shots fired by police" at some point during the parking lot incident. (*See* Dkt. 52-4). Plaintiff claims Reyes made the call after Valadez fired, therefore demonstrating that she knew the gunshots she heard came from Valadez and not from the driver of the Tahoe. (Dkt. 62 at ¶ 18(c)). Defendants claim she made the call after *she* fired at the driver, in reference to herself. (Dkt. 57 at ¶ 55). The timing is not clear from the audio recordings. (Dkt. 52-4).

The Tahoe exited the parking lot and continued back onto 19th Street where it struck several more parked cars before coming to a stop. (Dkt. 57 at ¶ 58). The entire incident starting from the initial shooting on 23rd Street until the Tahoe exited the parking lot lasted approximately one and half minutes, sixteen seconds of which occurred in the church parking lot. (Dkt. 57 at ¶ 56).

## **LEGAL STANDARD**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists whenever 'there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.'" *Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 482 (7th Cir. 2018), *reh'g denied* (Oct. 30, 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The nonmovant bears the burden of demonstrating that such a genuine issue of material fact exists. *Id.* Courts do not weigh the evidence or make credibility determinations when deciding motions for summary judgment. *See Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Rather, the Court must construe all

factual disputes and draw all reasonable inferences in favor of the nonmoving party. *Horton*, 883 F.3d ag 948. However, "when video footage clearly contradicts the nonmovant's claims, [the Court] may consider that video footage without favoring the nonmovant." *Id.* at 944 (citing *Scott v. Harris*, 550 U.S. 372, 378–381 (2007)); *see also Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir.), *cert. denied*, 137 S. Ct. 335 (2016).

## DISCUSSION

Plaintiff alleges claims of excessive force in violation of Cruz's Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 against the Officers and of wrongful death under Illinois law against all Defendants. Defendants move for summary judgment on both counts.

### I. Excessive Force

The Defendant Officers maintain they are entitled to summary judgment on Plaintiff's excessive force claim on the grounds that their use of deadly force constituted a reasonable act in self-defense and to prevent escape in defense of others and, in any event, that they are entitled to qualified immunity because their conduct did not violate a clearly established rule at the time of the shooting. (Dkt. 53).

#### A. Reasonable Use of Deadly Force

Excessive force claims are governed by the Fourth Amendment's objective reasonableness standard. *See Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). In conducting the reasonableness analysis, the Court must look to the totality of the circumstances and pay "'careful attention' to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Strand v. Minchuk*, No. 18-1514, 2018 WL 6432960, at *3 (7th Cir. Nov. 8, 2018) (quoting *Graham*, 490 U.S. at 396). The

analysis must be "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and must "allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Weinmann v. McClone*, 787 F.3d 444, 449 (7th Cir. 2015) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014)). An officer's subjective intent or motivation is irrelevant. *Strand*, 2018 WL 6432960, at *3. "What is important is the amount and quality of the information known to the officer at the time he fired the weapon." *Weinmann*, 787 F.3d at 449 (citing *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002)).

"Deadly force may be used if the officer has probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape." *Muhammed*, 316 F.3d at 683 (*quoting Tennessee v. Garner*, 471 U.S. 1, 11–12 (2002)); *see also Weinmann*, 787 F.3d at 448 ("[A] person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force."). Defendants argue the Officers' use of deadly force was justified on both grounds: to defend themselves against a serious threat of death or bodily injury and as a means to prevent the escape of an armed and dangerous offender.

1. **Self-Defense**

The Officers claim that when they fired at Cruz in the parking lot, they reasonably believed he was armed and about to shoot at them through his lowered car window. The Court looks to the

information the Officers had at the time they fired the shots to determine whether this belief was reasonable.

Both Officers had an objectively reasonable basis for believing there was a gun in the Tahoe and that it was accessible to the driver. They had observed someone in the rear passenger seat of the Tahoe shoot into another vehicle and then followed the Tahoe from the scene of that shooting to the parking lot without ever seeing the gun get thrown from the car. Moreover, because the windows were tinted, they could not see into the vehicle to determine which occupant, if any, had the gun by the time the Tahoe reached the parking lot. However, deadly force is not justified merely because an individual has access to a firearm. *See Weinmann*, 787 F.3d at 449 (use of deadly force not objectively reasonable where it was disputed as to how victim was holding the gun and whether it was pointed at the officer); *see also, e.g., Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013) (no probable cause to feel threatened by assailant who held shotgun in one hand, muzzle pointed to the ground and made no sudden moves or threats).

Valadez claims he believed Cruz lowered his window while making the three-point turn to shoot at him and Reyes. But whether Cruz rolled the window down at that time is disputed and Plaintiff provided sufficient evidence through the "screen grabs" of the driver's side window such that a reasonable juror could find that the window was down before the Tahoe even entered the parking lot. This fact is material because without it Valadez has no basis for believing Cruz was preparing to shoot at him or Reyes. Indeed, the fact that Cruz then preceded to drive the Tahoe toward the exit away from Valadez undermines such belief. Moreover, a jury could find based on the video that Valadez continued to shoot at the Tahoe as it drove away from him, which would weaken any argument that the use of deadly force was in self-defense. *See Scott v. Edinburg*, 346 F.3d 752, 757–58 (7th Cir. 2003) ("If the fatal shot was fired while [the assailant] was driving

9

away, then the argument that [the officer] was compelled to fire in order to protect himself would be significantly weakened.").

Reyes claims she believed she was about to be shot at because she heard gunshots. But again, Plaintiff raises a genuine issue of material fact as to whether Reyes knew the gunshots she heard came from Valadez and not from the Tahoe. Reyes herself testified that she did not know who fired the shots and the audio recording could support either position. Additionally, Reyes testified that she saw the driver's window was down and could see the profile of the driver but never that she saw Cruz fire a gun or even whether he had a gun.

Defendants also claim Reyes was justified in firing at Cruz because he was trying to run her over. It is true that an "automobile may be used as a deadly weapon." *Scott*, 346 F.3d at 757. However, Reyes testified that she could see the profile of the driver's face, which she would not have been able to do if the Tahoe had been coming at her head on in the parking lot. Additionally, the video shows the Tahoe going directly for the exit gate and not for Reyes. While Reyes was in the general direction of the exit, she was not in the Tahoe's direct path to the exit but rather to the left, positioned behind a parked car. To hit Reyes, the Tahoe would have had to change course away from the exit gate. It did not do so. A reasonable juror viewing the video could certainly conclude the driver of the Tahoe was aiming for the exit and not for Cruz.

Defendants rely primarily on *Horton v. Pobjecky* to support their claim of self-defense. 883 F.3d 941 (7th Cir. 2018). In *Horton*, an unarmed off-duty police officer was the only customer in a pizzeria when four men entered and attempted to rob the store. *Id.* at 944–45. One of the men had a revolver and pointed it at the officer and the store manager; the store manager also had a gun on his hip. *Id.* at 945. The manager grabbed the assailant's gun and a struggle ensued between the officer, the manager, and three of the men to gain control of the two guns. *Id*. The officer and

10

manager won and the officer shot all four assailants in the back, including one assailant fatally three times as he crawled toward the door. *Id.* at 946. The officer never identified himself as police or gave any verbal commands before shooting. *Id.* The Court held that the officer reasonably believed the men posed an imminent threat of death or serious harm, including the deceased assailant who was moving toward the exit when shot. *Id.*

Defendants argue this case is no different but, in fact, it is distinguishable. In *Horton*, the Court reasoned that the entire encounter lasted only 36 seconds and surveillance video from the pizzeria "demonstrate[d] [the officer] was in close quarters with multiple, moving, potentially armed assailants, who forced him to make split-second, life-or-death decisions," *id.* at 947, and that the deceased approached the officer "during an armed robbery . . . generally from behind, in close quarters, and the [officer] turned to confront the threat and immediately shot [him]." *Id.* at 952. Here, all four assailants were together inside the car and within the Officers' view. They were in a parking lot and not in a confined space; there was certainly no physical struggle over a weapon. Whether Cruz and the other occupants of the Tahoe ever threatened harm to the officers—for example, by trying to run them over or rolling down the window to shoot—at any point before shots were fired is disputed; unlike in *Horton*, the video does not conclusively resolve this. In short, unlike in *Horton*, factual disputes preclude finding after considering the totality of the circumstances that Cruz posed an imminent threat of death or serious harm to the Officers.

Finally, Defendants argue that the Officers reasonably believed Cruz was a serious threat to their safety because he had previously tried to injure them by backing into the police vehicle before entering the parking lot, as Valadez was exiting the vehicle and announcing his office. Plaintiff disputes some of these facts but regardless, by the time the Officers were in the parking lot the circumstances had changed. At the time shots were fired, the Officers were outside of their

11

vehicle, moving freely about the parking lot and out of the direct driving path of the Tahoe. The scope of constitutional permission to use deadly force is limited. *Horton*, 883 F.3d at 950. Even if Cruz reversing into the police vehicle justified the use of deadly force at that moment, that moment had passed. *See id.* ("Even though an officer may in one moment confront circumstances in which he could constitutionally use deadly force, that does not necessarily mean he may still constitutionally use deadly force the next moment."). Once that threat had ceased, the Officers were not free to shoot at Cruz absent other circumstances warranting deadly force. *Id.* ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.") (quoting *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993)).

Resolving all conflicts in the evidence in favor of Plaintiff, as it must on summary judgment, the Court finds that a jury could conclude the Officers were objectively unreasonable in believing Cruz posed an immediate and serious threat to their safety at the time they fired their weapons.

### 2. Preventing Escape in Defense of Others

Whether the Officers were justified in using deadly force as a means of preventing Cruz's escape is a separate issue. "[W]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Brosseau v. Haugen*, 543 U.S. 194, 197–98 (2004) (quoting *Garner*, 471 U.S. at 11). "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Garner*, 471 U.S. at 11–12 (1985).

Defendants argue the use of deadly force was justified as a reasonable means to prevent the escape of an armed fleeing felon who posed an imminent threat of serious harm to others.

At the time the Officers fired at Cruz, they knew that Cruz had been involved in the drive-by shooting of the Lincoln Navigator, a forcible felony; that there was still at least one gun in the Tahoe; and that Cruz had recklessly driven through the city streets and crashed into several parked cars apparently without concern for other motorists or pedestrians. These facts are not disputed and establish probable cause to believe Cruz had committed a crime involving at least the threat of serious physical harm, both in the drive-by shooting and reckless driving. *See, e.g., Plumhoff v. Rickard*, 572 U.S. 765, 776 (2014) (finding that assailant's "outrageously reckless driving posed a grave public safety risk"). The video also established there were pedestrians and motorists in the vicinity of the church parking lot around the time the Tahoe arrived on the scene. *Muhammed*, 316 F.3d at 683 ("[W]hen an officer believes that a suspect's actions [place] him, his partner, or those in *the immediate vicinity* in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force.") (emphasis added) (quoting *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988)). The Tahoe continued to pose a threat of serious harm to those pedestrians and motorists in the vicinity even as it left the parking lot. It does not matter for purposes of preventing escape whether Cruz had already driven past the Officers when they fired their weapons so long as the Officers had probable cause to believe he had committed a crime threatening serious harm or reasonably believed the Cruz posed a threat of serious harm to others in the vicinity, which they did. *See Horton*, 883 F.3d at 952 ("Even if [the deceased] had already crawled past [the officer], it was still reasonable for [the officer] to shoot him in the back to prevent escape."); *Plumhoff*, 572 U.S. at 777 (2014) ("[T]he record conclusively disproves respondent's claim that the chase . . . was already over when petitioners began shooting. . . . [A]ll that a

13

reasonable police officer could have concluded was that [the assailant] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road."); *Scott*, 346 F.3d at 758 (use of deadly force permissible to protect third parties where the officer "knew that [the assailant] already had committed a forcible felony and had attempted to run him down in order to escape or at least had acted recklessly with respect to that possibility . . . and was escaping at a high rate of speed through a parking lot with twelve to fourteen bystanders and demonstrating little concern for anyone's safety")

Plaintiff argues Defendants never gave any warnings before firing on Cruz to prevent escape. But *Garner* requires an officer to give some warning only "where feasible." *Id.* at 11–12. Either way, Defendants testified that they gave several warnings: Valadez when he first attempted to exit the police vehicle and then as he entered the parking lot and Reyes as the Tahoe drove toward the exit of the parking lot. The audio recording confirms that Reyes instructed Cruz to "stop" the vehicle several times before firing. Plaintiffs counter only with evidence that Cabello and Nava never heard these warnings from inside the car—evidence which fails to contradict the Officers' testimony.

Therefore, while the Court does not find Cruz posed an imminent threat to the *Officers* at the time of the shooting—as they were on foot and out of the Tahoe's driving path—the Officers could have reasonably believed Cruz posed an imminent threat to *others* if he escaped. Defendants are entitled to summary judgment on the excessive force claim.

### B.    Qualified Immunity

Defendants argue in the alternative that they are protected by qualified immunity. "A state official is protected by qualified immunity unless the plaintiff shows: '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the

14

challenged conduct.'" *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (quoting *Kemp v. Liebel*, 877 F.3d 346, 350–51 (7th Cir. 2017)). "If either inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Id.* (quotation omitted). Because the Officers reasonably used deadly force to prevent Cruz's escape, they violated no right, and the Court therefore need not address the second, "clearly established" prong. Defendants are protected by qualified immunity.

## II. Wrongful Death

Defendants argue they are entitled to summary judgment on Plaintiff's state law wrongful death claim because the use of deadly force was justified under 720 ILCS 5/7-5. To sustain a wrongful death claim, Plaintiff must show that Cruz's death was caused by "wrongful act, neglect or default." 740 ILCS 180/1. 720 ILCS 5/7-5 provides that an officer is justified in the use of deadly force:

> [W]hen he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or such other person, or when he reasonably believes both that:
>
> (1) Such force is necessary to prevent the arrest from being defeated by resistance or escape; and
>
> (2) The person to be arrested has committed or attempted a forcible felony which involves the infliction or threatened infliction of great bodily harm or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

*Id.* at § 5/7-5(a). Therefore, the wrongful death claim fails for the same reasons as Plaintiff's excessive force claim under § 1983: the Officers acted objectively reasonable in using deadly force to prevent Cruz's escape after having witnessed him commit a forcible felony threatening great bodily harm and believing he continued to pose a threat to others in the vicinity if allowed to escape. *See Muhammed,* 316 F.3d at 683 (applying the same rule to plaintiff's federal excessive

force claim and Illinois wrongful death claim); *see also, e.g., Horton v. City of Chicago*, No. 13-CV-6865, 2018 WL 4699790, at *12 (N.D. Ill. Sept. 30, 2018) (same).

Furthermore, the Illinois Tort Immunity Act provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. "Willful and wanton conduct" is "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety or others or their property." *Id.* at § 10/1-210. Because the Officers' actions were objectively reasonable, they cannot be willful and wanton and Defendants are entitled to immunity under Illinois law. *Horton*, 883 F.3d at 954

## **CONCLUSION**

For the reasons stated above, the Court grants Defendants' Motion for Summary Judgment (Dkt. 51) on both counts.

Hon. Virginia M. Kendall
United States District Judge

Date: February 8, 2019